**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re:                                          :        Chapter 11
                                                :
RIO MALL, LLC,                                  :        Case No. 18-17840-EPK
                                                :
        Debtor.                                 :
_____/

**MOTION OF SECURED CREDITOR, INVESTORS BANK, PURSUANT TO**
**11 U.S.C. § 1112(b) AND 11 U.S.C.A. § 362(d)(2) TO**
**DISMISS THE CHAPTER 11 CASE OR, IN THE ALTERNATIVE,**
**FOR RELIEF FROM THE AUTOMATIC STAY**

Secured Creditor, Investors Bank, by and through its undersigned counsel, hereby moves this Court (the "**Motion**") for entry of an order, pursuant to 11 U.S.C. §§ 1112(b), 362(d) and 105(a): (i) dismissing the above-captioned Chapter 11 case (the "**Chapter 11 Case**") of Rio Mall, LLC (the "**Debtor**") (or converting the Chapter 11 Case to a Chapter 7 case) for bad faith; or, in the alternative, (ii) granting stay relief under § 362(d) due to lack of equity in the real property and no prospect of reorganization. In support of this Motion, Investors Bank respectfully represents as follows:

**I.        PRELIMINARY STATEMENT**

1.        This SARE Chapter 11 Case must be dismissed because it was filed in bad faith, mere hours before the New Jersey Superior Court was poised to appoint a receiver over the single asset real estate of the Debtor in the pending two-party dispute between the Debtor and Investors Bank. The single asset of the Debtor is a partially-tenanted mall located in Rio Grande, New Jersey (the "**Real Property**"), upon which Investors Bank holds the first mortgage and an assignment of rents and leases. As set

forth in detail, below, the *Phoenix Piccadilly* factors, among others to be considered by this Court, are easily satisfied and warrant the dismissal of this case.

2.      Investors Bank is entitled to relief from the automatic stay because there exists no equity in the Real Property.  As acknowledged by the Debtor in its Motion to Use Cash Collateral [D.E. 9, ¶ 6], it owes the Bank—by its own calculations—over $8,788,000.  Actually, the Debtor owes the Bank $9,251,387.44 as of July 24, 2018. *See* Certification of Andrew Rohmeyer, ¶ 5, attached hereto as **Exhibit 1**.  Debtor also acknowledges that it owes National Commercial Builders over $756,000, evidenced by a construction lien against the Real Property [D.E. 9, ¶ 7].  The total debt secured by liens against the Real Property exceeds $10,000,000. Although the Debtor estimates that the Real Property is worth $10,000,000 [D.E. 9, ¶ 5], it does so without any support.[1]  Perhaps that may have been the value of the Real Property *before* Kmart (the anchor tenant) and other tenants moved out, as an appraisal obtained by the Bank in June 2017 (attached to the Rohmeyer Cert. as Exhibit A) states the value of the Real Property at that time to be $10,400,000.  Rohmeyer Cert., ¶ A; Rohmeyer Cert, Ex. A (Appraisal) at 2.  This mid-2017 value is derived from, and contemplates, the receipt of rent and CAM payments from the anchor tenant, Kmart Corporation; that rent constituted more than *50%* of the cash flow at the Real Property and the Kmart CAM payments constituted more than *85%* of the total CAM charges paid to the Debtor. Rohmeyer Cert., Ex. A (Appraisal) at 51.  The Kmart lease terminated in July, 2018 and

---

[1] Also unsupported is Debtor's statement in its recently filed Schedules that the Real Property is worth $10,812,733.86, while the unsupported value identified in the June 30, 2018 balance sheet is $10,657,907.15.  Allowing for a typical real estate brokerage commission of at least 5% to sell the Real Property, the net value (according to Debtor's estimated values) falls well below the $10,000,000 sum of the secured debt.

Kmart stopped paying CAM charges over a year ago (contending that it was long over-billed by the Debtor for CAM charges). Without Kmart, the value of the Real Property dramatically plummeted. Common sense dictates that the current value of the partially-tenanted Real Property is well-below the amount owed to Investors Bank.  The Real Property has no  equity – for unsecured creditors and certainly not for the owner.[2]

3.      Stabilization of the Real Property is unrealistic.  Stabilization would require new tenants, significant money to fund fit-out improvements to accommodate those new tenants and significant money to pay a commission to the real estate brokers procuring those new tenants.  Even if Debtor's dream comes true and new tenants are found, Debtor has no money to pay for tenant fit-up or brokerage commissions. Pursuant to the Debtor's Schedules and Cash Collateral Budget, there is not sufficient rental income to make adequate protection payments to Investors Bank.  At the non-default rate of 4.0%, monthly interest payments exceed $29,000.  Because Debtor defaulted to Investors Bank well before the Chapter 11 was filed, interest on the Investors Bank debt accrues at the default rate of 9% per annum - $65,250 per month. For the 3-month budget, assuming delinquent tenants actually pay rent and no payments to Investors Bank, Debtor is cumulatively cash positive about $37,000.  Without adequate protection payments, the Bank's debt continues to climb every month, further eroding any possibility of future equity in the Real Property.

4.      Investors Bank is entitled to relief from the automatic stay because the Real Property cannot be the cornerstone for an effective reorganization and the Debtor will be unable to propose a feasible and confirmable plan of reorganization because:

---

[2] If this case is converted to Chapter 7, the Trustee can be expected to abandon the single-asset real estate of the Debtor.

3

**BROAD AND CASSEL LLP | ATTORNEYS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | broadandcassel.com

a.      The condition and value of the Real Property are deteriorating;

b.      The Real Property in unable to generate sufficient cash flow to meet current secured debt service, pay common area maintenance expenses, pay real estate taxes or fund new tenant fit up expenses;

c.      This case is essentially a two-party dispute between Investors Bank and the Debtor;

d.      The Debtor and Investors Bank have been, for a long time, locked in an irreconcilable dispute with no prospect of settlement because neither the Debtor nor its principal has the financial resources to fund the means for satisfying the Investors Bank claim or the fit up expenses to bring new tenants to the Real Property; and

e.      Despite considerable efforts by the Debtor to seek "angel" financing, Debtor has not been able to find a suitable arrangement to satisfy its debt to Investors Bank.

Simply put, without the consent of Investors Bank—which will not be given—the Debtor has no prospect of reorganization.  Continuing this Chapter 11 Case will be futile.

## II.      <u>JURISDICTION, VENUE, AND STATUTORY PREDICATES</u>

5.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be adjudicated by this Court.  For purposes of a hearing on this Motion only, venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates

4

for relief sought herein are 11 U.S.C. § 1112(b), 11 U.S.C. § 362(d), and § 105(a) of the Bankruptcy Code.

### III.   BACKGROUND

### A.   General Bankruptcy Case Background

6.      On June 28, 2018 (the "**Petition Date**"), the Debtor filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

7.      The Debtor maintains control and possession of the Real Property and continues to operate its business as a debtor-in-possession pursuant to  §§1107 and 1108 of the Bankruptcy Code.  To date, no trustee or official committee of unsecured creditors has been appointed in this case.

### B.   Factual Background

8.      As of July 24, 2018, the Debtor is indebted to Investors Bank in the amount of $9,251,387.44 (the "**Investors Bank Claim**").  The Investors Bank Claim arises out of a $9,800,000.00 loan made by Investors Bank to the Debtor on December 14, 2015.  That loan is secured by a Mortgage and Security Agreement on the Real Property and all other assets of the Debtor, an Assignment of Rents, an Environmental Indemnity Agreement, a Guaranty of Frank Investments, Inc. and Bruce S. Frank, and perfected UCC Financing Statements.[3]

9.      The loan from Investors Bank to Debtor consisted of two components:

---

[3] Frank Investments, Inc. ("**FII**") is an affiliate of the Debtor and Bruce S. Frank is the principal of Frank Investments, Inc. and the Debtor.

**BROAD AND CASSEL LLP | ATTORNEYS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | broadandcassel.com

a.      $8,200,000 to refinance a then existing mortgage loan on the Real Property; and

b.      $1,600,000 as a construction loan to expand a movie theater (owned by an entity then controlled by Bruce Frank) at the Real Property and to fund accrued deferred maintenance for the Real Property.

10.     Prior to the Petition Date, the Debtor defaulted under its loan obligations to Investors Bank for the following reasons, among others:

a.      Failure to make any monthly payments of principal and interest since July 1, 2017;

b.      Failure to deposit all rental income from the Real Property into the requisite operating account of the Debtor at Investors Bank;

c.      Failure to escrow funds with Investors Bank necessary to pay real estate taxes;

d.      Failure to pay real estate taxes;

e.      Failure to pay 30% of each construction payment application submitted for the project at the Real Property, as required by the loan agreement;

f.      After notice of a deficiency in connection with the construction project, failure to either (i) invest in the project an amount equal to the deficiency or (ii) deposit with Investors Bank an amount sufficient to eliminate the deficiency;

g.      Failure to invest into the project an amount equal to the portion of the Debtor's equity requirement;

h.    Failure to complete the construction project and draw down the restricted escrow account within 18 months from December 14, 2015;

i.    Failure to provide to Investors Bank the certified rent rolls, operating statements and leases that were due within 90 days of the close of each fiscal year of the Debtor;

j.    Failure to provide to Investors Bank the annual financial statements of the Debtor and guarantors that were due within 90 days of the close of each fiscal year of the Debtor;

k.    Failure to provide to Investors Bank the copies of Debtor's Federal tax returns that were due within ninety days of the close of each fiscal year of the Debtor;

l.    Failure to maintain a compensating balance account at Investors Bank with a minimum monthly balance equal to 1/12th of the annual rents of the Real Property (approx. $91,000), which was to have been fully funded within eight months of December 14, 2015;

m.    Failure to establish a tenant improvements/leasing commissions reserve, in a restricted account at Investors Bank, with $10,000 to be deposited monthly from the inception of the loan;

n.    The occurrence of a work stoppage on the project lasting longer than 60 days;

o.    Failure to manage the Real Property in a professional and competent manner; and

p.    A material adverse change in the financial condition of the Debtor.

7

11.    Because of the defaults, Investors Bank commenced (i) a commercial mortgage foreclosure action against the Debtor in the Superior Court of New Jersey, Cape May County, Chancery Division, at case number SWC-F-006663-18 (the "**Foreclosure Action**") and (ii) an action on the note and guaranty for recovery of all amounts due and owing by the Debtor and guarantors in the Superior Court of New Jersey, Cape May County, Law Division, at case number CPM-L-000105-18 (the "**Law Division Action**").

12.    Without question, both the Law Division Action and the Foreclosure Action are two-party disputes between Investors Bank and the Debtor.

13.    Shortly after filing of the Law Division Action and Foreclosure Action, Investors Bank filed a Motion for the Appointment of a Receiver in the Foreclosure Action (the "**Receivership Motion**"). Debtor did not contest the Receivership Motion.

14.    Mere hours before the hearing on the Receivership Motion and the expected appointment of a receiver by the Court, the Debtor commenced this Chapter 11 Case in Florida.

## IV.    RELIEF REQUESTED AND REASONS THEREFOR

15.    By this Motion, Investors Bank requests entry of an order, substantially in the form attached hereto as **Exhibit 2**, dismissing this Chapter 11 Case (or converting it to a Chapter 7 case) or, alternatively, granting Investors Bank relief from the automatic stay.

8

**BROAD AND CASSEL LLP | ATTORNEYS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | broadandcassel.com

**A.    This Chapter 11 Case Should Be Dismissed (or Converted to Chapter 7)[4] Because It Was Filed in Bad Faith**

16.    Section 1112(b) of the Bankruptcy Code permits dismissal of a bankruptcy case for cause.  "A case under Chapter 11 may be dismissed for cause pursuant to section 1112 of the Bankruptcy Code if the petition was not filed in good faith."  *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir.1988); *In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir.1984); *In re Midway Invs.,* 187 B.R. 382, 389 (Bankr.S.D.Fla.1995).

17.    Pursuant to *Phoenix Piccadilly,* "courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions' or in particular, factors which evidence that the petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." 849 F.2d at 1394 (quoting *Albany Partners,* 749 F.2d at 674).

18.    *Phoenix Piccadilly* establishes the following factors which form the basis of a bad faith filing: (1) the Debtor has only one asset, the property at issue; (2) the Debtor has few unsecured creditors whose claims are relatively small compared to the claims of the secured creditors; (3) the Debtor has few employees; (4) the property is subject to a foreclosure action as a result of arrearages on the debt; (5) the debtor's financial problems essentially are a dispute between the Debtor and the secured creditors which can be resolved in the pending state court action; and (6) the timing of the Debtor's filing

---

[4] A party in interest has the right to request the bankruptcy court either to convert a Chapter 11 case to a Chapter 7 proceeding or to dismiss the case, "whichever is in the best interest of creditors and the estate, for cause, including ... [the] inability to effectuate substantial consummation of a confirmed plan [or a] material default by the debtor with respect to a confirmed plan...." *Id.* § 1112(b)(7), (8).

**BROAD AND CASSEL LLP | ATTORNEYS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | broadandcassel.com

evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.  849 F.2d at 1394–95.

19.    Although courts addressing the issue of whether the *Piccadilly* standard applies in single asset real estate cases are split, this Court has held, in *In re State Street Houses, Inc.*, 305 B.R. 738 (S.D. Florida Bankr, 2003), that the Court elects to follow the line of cases holding that the *Piccadilly* factors are appropriate *guidelines* for consideration when evaluating whether a Chapter 11 petition in a single asset real estate case was filed in bad faith.  305 B.R. at 743.

20.    Applying the *Piccadilly* guidelines to this Chapter 11 Case, as well as any other factors that weigh on the Debtor's intentions—including evidence of an intent to abuse the judicial process and debtor's intent to delay or frustrate legitimate efforts of secured creditors to enforce their rights, *In re Star Trust*, 237 B.R. 827, 42 Collier Bankr. Cas. 2d (MB) 1242 (Bankr. M.D. Fla. 1999); *In re Blunt*, 236 B.R. 861, 34 Bankr. Ct. Dec. (CRR) 858 (Bankr. M.D. Fla. 1999)—it is evident that this Chapter 11 Case was filed in bad faith.

21.    First, the Debtor has only one asset – the Real Property.  Debtor's Chapter 11 Petition, at ¶7, acknowledges and describes Debtor's business as single asset real estate.

22.    Second, the Debtor has few unsecured creditors, the aggregate of whose claims are relatively small compared to the claims of the secured creditors.  The Debtor's Schedule of Unsecured Creditors [ECF No. 28] lists only *five* unsecured

creditors.[5]  Of the five unsecured creditors, only one creditor—Kmart Corporation—has a claim of $220,000 that is disputed by the Debtor.[6]  The remaining unsecured claims total $75,662.99 and are undisputed.

23.    In comparison, the Debtor admits that it owes Investors Bank in excess of $8,788,000.  Investors Bank is owed $9,251,387.44 as of July 24, 2018.  The Debtor also  acknowledges that it owes National Commercial Builders over $756,000, pursuant to a construction lien filed against the Real Property.  Under these circumstances, the Debtor's few unsecured creditors have claims that are relatively small in comparison to the claims of the secured creditors.  *See* 11 U.S.C.A. § 1112(b); *In re Lezdey*, 332 B.R. 217, 45 Bankr. Ct. Dec. (CRR) 165 (Bankr. M.D. Fla. 2005) (Debtor's lack of meaningful number of unsecured creditors in relation to indebtedness owed to one major creditor is factor in deciding whether Chapter 11 case should be dismissed as "bad faith" filing).

24.    Third, the Debtor has no known employees.  Management of the Debtor is performed by its principal, Bruce Frank and he cannot be fairly characterized as an "employee."  Debtor's Cash Collateral Budget (Exhibit A to D.E. 9) does not provide for payment to any employees.[7]

25.    Fourth, the Debtor's single asset is subject to a pending foreclosure proceeding as a result of the Debtor's (and guarantors') default on their loan obligations to Investors Bank.  This Chapter 11 Case was commenced on the eve of a hearing by

---

[5] Although additional unsecured creditors are scheduled, none have an amount stated and appeared to be scheduled for notice purposes only.

[6] Debtor has a claim against Kmart for unpaid CAM charges.  Kmart alleges that Debtor previously over-billed CAM charges to Kmart.  Debtor's claim against Kmart arises under the Debtor-Kmart lease; therefore that claim is included in the Investors Bank cash collateral.

[7] Debtor's financial information that was submitted to the Bank does not reflect any employee obligations.

**BROAD AND CASSEL LLP | ATTORNEYS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | broadandcassel.com

the New Jersey Superior Court to consider Investors Bank's Receivership Motion.  That motion was predicated upon, among other things, diversion of rents, diminution of value of the Real Property, failure to pay real estate taxes, and forgone maintenance of the Real Property.

26.    Although Debtor's Statement of Financial Affairs is incomplete for failure to disclose payments to insiders, Debtor filed an application [D.E. 30] seeking an extension until August 2, 2018 to supplement its SOFA to fully reveal the insider payments made during the year preceding the filing of its Chapter 11 Petition.  Based upon recent information from the Debtor, the SOFA supplement is anticipated to reveal very significant payments to insiders and affiliates of the Debtor during the preceding twelve month - while the debt owed to Investors Bank remained unpaid and real estate taxes continued to accrue.  Essentially, the Bank's cash collateral was misappropriated by the Debtor for the benefit of various insiders and affiliates.

27.    Fifth, the Debtor's financial problems (a lack of money) created a simple dispute between the Debtor and Investors Bank, a dispute that can easily be resolved in the pending state court actions.  Of the five unsecured creditors scheduled by the Debtor, four are "undisputed." Only the Kmart claim is disputed and there was not litigation pending between Kmart and the Debtor as of the Chapter 11 filing date. Although Debtor may claim that its financial problems are the result of losing tenants at the Property, the reality is that the Chapter 11 filing would have been unnecessary had Investors Bank refrained from pursuing its remedies following Debtor's defaults under the applicable loan documents.  In other words, but for Debtor's defaults with Investors Bank, this Chapter 11 proceeding would not have been filed.

BROAD AND CASSEL LLP | ATTORNEYS AT LAW
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | broadandcassel.com

28.     Generally, courts do not condone use of Chapter 11 to resolve two-party disputes in bankruptcy court when litigation is already pending in non-bankruptcy forum prior to commencement of case.  11 U.S.C.A. § 1112(b); *In re Serfass*, 325 B.R. 901 (Bankr. M.D. Fla. 2005).   Where Chapter 11 debtor's reorganization effort involves essentially a two-party dispute that is resolvable in state court, dismissal for "cause" is warranted. *In re Shar*, 253 B.R. 621 (Bankr. D. N.J. 1999); *In re Starmark Clinics*, LP, 388 B.R. 729, 49 Bankr. Ct. Dec. (CRR) 251, 59 Collier Bankr. Cas. 2d (MB) 914, 59 Collier Bankr. Cas. 2d (MB) 1259, Bankr. L. Rep. (CCH) P 81220 (Bankr. S.D. Tex. 2008) (Chapter 11 debtor's attempt to use the provisions of the Bankruptcy Code to gain an unfair advantage in a two-party dispute strongly supports a finding of cause for dismissal of the case).

29.     Sixth, the timing of the Debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the Debtor's secured creditors to enforce their rights. The Debtor's 11th hour filing of its voluntary bankruptcy petition was singularly to avoid the appointment of a receiver, and to "buy time" to find new tenants in an effort to avoid the foreclosure of Investors Bank's mortgage.  Debtor began its efforts to re-tenant the Real Property over a year ago. Its "strategy" included cessation of making monthly loan payments to Investors Bank and failure to pay real estate taxes on the Real Property. In the last 18 months, Investors Bank paid over $142,000 in local real estate taxes to avoid having unpaid real estate taxes create a lien senior to the Bank's mortgage.[8] By

---

[8] Debtor's to-be-filed filed Supplement to its Statement of Financial Affairs will disclose that Debtor used rents (Investors Bank collateral) to make payments to insiders rather than make monthly loan payments to Investors Bank or pay real estate taxes.

**BROAD AND CASSEL LLP | ATTORNEYS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | broadandcassel.com

any measure, Debtor's actions can be construed as nothing other than an intent to delay the legitimate efforts of Investors Bank to enforce its rights.

30.      Seventh, the Debtor filed this case in an improper venue to unnecessarily inconvenience each of its creditors.  An entity may only commence a case under Title 11 in the district in which the debtor's domicile, residence, principal place of business or principal assets is located.  The undisputed facts before this Court plainly establish that the Debtor does not meet the criteria to maintain its single-asset Chapter 11 Case in this venue.  For example:

a.      The business of the Debtor is the operation of the Real Property in the State of New Jersey;

b.      The Debtor is a limited liability company organized under the laws of the State of New Jersey;

c.      The Debtor's single-asset—the Real Property—is located in New Jersey;

d.      All but one of the Debtor's listed creditors are located in New Jersey;

e.      Under the applicable loan documents, the Debtor was required to conduct all of its banking with Investors Bank in New Jersey;

f.      All of the Debtor's customers are located in New Jersey;

g.      All of the Debtor's tenants are located in New Jersey;

h.      The Debtor owns no real property in Florida; and

i.      The Debtor owns no personal property in Florida.

BROAD AND CASSEL LLP | ATTORNEYS AT LAW
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | broadandcassel.com

31.     The Debtor's connection to Florida is simply a business address that the Debtor unilaterally identifies as its principal place of business, convenient to the principal's residence, and from which Bruce Frank operates several other business enterprises.

32.     Bankruptcy Rule 1014(a)(2) provides that if a petition is filed in an improper district, the case may be dismissed or transferred to any other district if the court determines that such transfer is in the interest of justice **or** for the convenience of the parties.  *See, e.g., The Paul H. Shield, MD, Inc. Profit Sharing Plan v. Northfield Labs, Inc. (In re Northfield Labs, Inc.)*, 467 B.R. 582, 590 (Bankr. D. Del. 2010) ("Section 1412 is phrased in the disjunctive and a proceeding is subject to transfer upon a sufficient showing that either the interest of justice or the convenience of the parties is met.").

33.     In determining whether transferring venue is in the interests of justice or convenient to the parties, Florida courts consider the following factors, weighing those factors differently based on the facts and circumstances of each case:

     i.  The proximity of creditors of every kind to the Court;

    ii.  The proximity of the debtors to the Court;

   iii.  The proximity of the witnesses necessary to the administration of the estate;

   iv.  The location of the assets;

    v.  The economic administration of the estate; and

   vi.  The necessity for ancillary administration if liquidation should result.

**BROAD AND CASSEL LLP | ATTORNEYS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | broadandcassel.com

*In re The Newport Creamery, Inc.*, 265 B.R. 614, 618 (Bankr. M.D. Fla. 2001) (*citing In re Commonwealth Oil Refining Co., Inc.*, 596 F.2d 1239 (5th Cir. 1979), *cert. denied* 444 U.S. 1045 (1980).   In addition, a number of courts have included as an additional consideration or factor, "a state's interest in having local controversies decided within its borders."  *In re The Newport Creamery, Inc.*, 265 B.R. at 618 (citations omitted).[9]

34.   In contrast to the Debtor's deep roots in New Jersey, the Debtor's connection to Florida is nominal, at best, and certainly do not warrant a bankruptcy filing in the Southern District of Florida.  Upon information and belief, the Debtor does not (i) have any employees, assets, or operations in Florida or (ii) conduct business in Florida. Indeed, the Debtor was not formed in Florida.  The Debtor's only arguable nexus to Florida is that it utilizes a Florida address—the same Florida address of Frank Investments, Inc., and likely other entities owned by Bruce Frank.  Such a thin connection (particularly in comparison to the overwhelming connections to the State of New Jersey), begs the question as to why the Debtor would choose to pursue a course of action such as this in a location so far away from the location of its principal assets, customers, tenants, creditors and business.

35.   In this instance, although Investors Bank is *not* seeking a transfer of venue, the aforementioned factors further illustrate the intent of the Debtor to delay and

[9] Other courts consider a host of additional factors, including: (1) plaintiff's original choice of forum; (2) defendant's forum preference; (3) whether the claim arose elsewhere; (4) location of books and records and/or the possibility of viewing the premises, if applicable; (5) convenience of the parties as indicated by their relative physical and financial condition; (6) convenience of the witnesses; (7) enforceability of the judgment; (8) practical considerations that would make trial easy, expeditious, or inexpensive; (9) the relative administrative difficulty of the two for a resulting from congestion of the courts' dockets; (10) the public policies of the fora; (11) the familiarity of the judge with the applicable state law; and (12) the local interest in deciding local controversies at home.  *See Zazzali v. 1031 Exch. Grp (In re DBSI, Inc.)*, 478 B.R. 192, 194-95 (Bankr. D. Del. 2012); *see also Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995) (listing factors within the context of 28 U.S.C. § 1404(a)).

frustrate the legitimate efforts of Investors Bank to enforce its rights, and to unnecessarily burden and inconvenience the Debtor's creditors. *See In re Star Trust*, 237 B.R. 827, 42 Collier Bankr. Cas. 2d (MB) 1242 (Bankr. M.D. Fla. 1999) (the so-called *Phoenix Piccadilly* factors used to determine whether Chapter 11 petition has been filed in good faith are merely a guide for exercise of bankruptcy court's discretion, the real test remains whether debtor has honest intention, and some real need and real ability, to effectuate aim of reorganization).

36.    Considering the foregoing factors in the aggregate, the Debtor's filing demonstrates an intent to abuse the judicial process.  Debtor's Chapter 11 filing is improper in many respects and, most fundamentally, was utilized for the improper purpose of delaying and frustrating the rights of Investors Bank.  These are improper grounds upon which to seek bankruptcy protection and trigger an automatic stay.

37.    By all measures, the *Piccadilly* factors, among others, are easily satisfied and demonstrate the lack of good faith on the part of the Debtor.  Consequently, the Debtor's Chapter 11 Case should be dismissed.

**B.**    **Alternatively, Investors Bank Is Entitled To Stay Relief Because There is No Equity in the Real Property and Because the Property is Not Necessary For an Effective Reorganization**

38.    Section 362(d)(2) of the Bankruptcy Code provides that the Court shall grant a secured creditor relief from the automatic stay if: (i) the debtor lacks equity in the property at issue; and (ii) the property is not necessary for an effective reorganization.  Both of these requirements are satisfied in this case and, therefore, stay relief is mandated by § 362(d)(2).

**BROAD AND CASSEL LLP | ATTORNEYS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | broadandcassel.com

39.     As acknowledged by the Debtor in its Motion to Use Cash Collateral [D.E. 9, ¶ 6], it owes the Bank—by Debtor's own calculations and without prejudice to the right of Investors Bank to contest same—over $8,788,000.  Actually, the Debtor owes the Bank $9,251,387.44 as of July 24, 2018.  In addition, the Debtor acknowledges that it owes National Commercial Builders over $756,000, pursuant to a mechanic's lien that has been filed against the Real Property [D.E. 9, ¶ 7].

40.     Although the Debtor estimates that the Real Property is worth $10,000,000 [D.E.. 9, ¶ 5], it does so without any support.

41.     Although that may have been the value of the Real Property *before* Kmart (the anchor tenant) and other tenants moved out, an appraisal obtained by the Bank in June 2017, attached to the Rohmeyer Cert. as Exhibit A, states the value of the Real Property at that time to be $10,400,000.  Rohmeyer Cert., ¶ A; Rohmeyer Cert., Ex. A (Appraisal) at 2.  This mid-2017 value is derived from, and contemplates, the receipt of rent and CAM payments from the anchor tenant, Kmart Corporation, which rent constituted more than *50%* of the cash flow at the Real Property, and which CAM payments constituted more than *85%* of the total CAM charges paid to the Debtor. Rohmeyer Cert., Ex. A (Appraisal) at 51.  As a consequence, the vacancy resulting from the termination of Kmart's lease obviously has a significant negative impact on the value of the Real Property, thus rendering the Real Property without equity.

42.     Further, there is little hope that the Real Property can be stabilized.  And in the event additional tenants are located, it is doubtful that the Real Property's value will provide any equity beyond the amounts due to the two secured creditors.  To be sure, pursuant to the Debtor's Schedules and Cash Collateral Budget, there are not

**BROAD AND CASSEL LLP | ATTORNEYS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | broadandcassel.com

sufficient funds coming in to the Debtor to make adequate protection payments.  Even at a non-default rate of 4.0%, that would exceed $29,000 per month.  For the 3-month budget and without payments to Investors Bank, Debtor is cumulatively cash positive about $37,000.  Thus, without adequate protection payments, the Bank's debt continues to climb every month, further eroding any possibility of equity in the Real Property.

43.     Given the elusive margin of equity with which the Debtor is playing, and the fact that the majority of cash flow and CAM payments have been lost, there has been a precipitous decline in the value of the Real Property since June 2017.  And because Investors Bank is consequentially currently undersecured, the requirement of § 362(d)(2)(A) is easily satisfied.

44.     The Real Property is also not necessary to an effective reorganization under § 362(d)(2)(B) because, even with the Real Property, it is clear that the Debtor will be unable to reorganize without the consent of Investors Bank, which controls the class of secured creditors.   Moreover, by virtue of its unsecured deficiency claim, Investors Bank will most likely control the unsecured class and will be able to effectively prevent cram down under § 1129. And if Investors Bank make an election under §1111(b), Debtor will not be able to satisfy the Investors Bank secured claim in full.

45.     Section 362(g) of the Bankruptcy Code provides that the Debtor bears the burden of proving that the property is necessary for an effective reorganization.  In order to satisfy this burden, the debtor must do more than merely show that if a reorganization is possible, the property is essential to such a reorganization.  Rather, the debtor must establish that the property is necessary for an *effective* reorganization that can occur within a reasonable period of time.  *In re Annicott Excellence, LLC*, 258 B.R. 278, 284

(Bankr. M.D. Fla. 2001), *citing United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 376 (1988) ("A debtor must do more than merely show that there is conceivably a possibility of reorganization.  A debtor must make a showing that an effective reorganization is reasonably possible within a reasonable time."); *Acquisition Corp. of America v. Fed. Savings & Loan Insur. Corp.*, 96 B.R. 380, 382 (S.D. Fla. 1988) ("As to the second requirement of 362(d)(2), the key word is *effective* reorganization. . . .  The mere fact that the property is indispensable to the Debtor's survival is insufficient.") (internal citations and quotation marks omitted, emphasis added).

46.    In this case, the Real Property is unnecessary for an effective reorganization and the Debtor will be unable to propose a feasible and confirmable plan of reorganization because, as noted above, without the consent of Investors Bank—which will not be given[10]—reorganization is not possible in this case.  Accordingly, there will be no reorganization of this Debtor under any circumstances.  Thus, and only if the Court does not dismiss this case, Investors Bank is entitled to complete relief from the automatic stay under § 362(d)(2).[11]  *See, e.g., In re Dollar Assocs.*, 172 B.R. 945, 953 (Bankr. C.D. Cal. 1994) ("where a debtor lacks equity in a property, it is appropriate to

---

[10] In light of the deteriorating condition and value of the Property and the Property's inability to generate sufficient cash flow, coupled with the fact that, with this two-party dispute between the Bank and Debtor, no prospect of settlement exists, the parties' interests are in conflict, and considerable efforts to work out the loan have failed, Investors Bank will not consent to a reorganization of the Debtor under any circumstances.  On top of that, any proposed plan will simply be an effort at redistributing funds to attend to long needed deferred maintenance and remedial upgrades to the Property, as the Debtor's members refuse to provide the necessary funds to do so and would prefer to utilize creditors' money for their own benefit.  This, of course, is unacceptable to Investors Bank and would be violative to the absolute priority rule.

[11] Stay relief is also appropriate under § 262(d)(3) because any plan proposed by the Debtor, even if filed within 90 days, has no realistic chance of being confirmed within a reasonable time.

**BROAD AND CASSEL LLP | ATTORNEYS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | broadandcassel.com

grant relief from stay if the moving creditor can block confirmation of any plan of reorganization").

### V.   <u>CONCLUSION</u>

47.   Based on the foregoing, Investors Bank requests that this Court enter an order dismissing this Chapter 11 case, or, alternatively, granting Investors Bank complete relief from the automatic stay.


Dated:  July 30, 2018                                    Respectfully submitted,


                                                         */s/ Gary M. Freedman*
                                                         Gary M. Freedman, P.A.
                                                         Florida Bar Number 727260
                                                         **BROAD AND CASSEL LLP**
                                                         2 South Biscayne Blvd., Suite 2100
                                                         Miami, FL  33131
                                                         Tel: (305) 373-9400
                                                         Fax: (305) 373-9443
                                                         gfreedman@broadandcassel.com

                                                         - and -

                                                         Harold G. Cohen, Esquire
                                                         (*pro hac pending*)
                                                         Jerry R. DeSiderato, Esquire
                                                         (*pro hac pending*)
                                                         **DILWORTH PAXSON LLP**
                                                         A Pennsylvania Limited Liability
                                                         Partnership
                                                         Liberty View
                                                         457 Haddonfield Road, Suite 700
                                                         Cherry Hill, NJ 08002
                                                         T: (856) 675-1900
                                                         hcohen@dilworthlaw.com
                                                         jdesiderato@dilworthlaw.com

                                                         *Counsel for Secured Creditor,*
                                                         *Investors Bank*